# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

SIMMONS INVESTMENTS, INC.,

*Plaintiff*,

vs.

Case No. 09-CV-2345 EFM/KMH

CONVERSATIONAL COMPUTING CORPORATION, STEPHEN RONDEL, CAL MITCHELL, F. DEAN HUBBARD, ALAN D. STONE, CURTIS PARRISH, ROBERT L. KEYS, PRIVATE CONSULTING GROUP, INC., KEYS BUSINESS GROUP, INC., DOES 1 through 50,

*Defendants*.

**MEMORANDUM AND ORDER**

This case arises out of what appears to be a bad investment by Plaintiff Simmons Investments, Inc. ("Simmons") in Defendant Conversational Computing Corporation ("Conversay"). According to Simmons, Conversay, through it representatives, made a series of material misrepresentations and omissions of material facts in order to get Simmons to first invest $700,000 in convertible notes in the Company, and then to extend the maturity date on the notes. Based on Defendants' misrepresentations and omissions, Plaintiff filed suit, asserting ten causes of action. Shortly thereafter, Defendants filed a motion to dismiss (Doc. 14), seeking to dismiss a number a Plaintiff's claims. Plaintiff filed an amended complaint, and Defendants filed another motion to

dismiss (Doc. 31), again seeking to dismiss a number of Plaintiff's claims. For the reasons stated below, the Court denies both of Defendants' motions.

## I. Background/Facts

In May and June of 2007, Defendants Private Consulting Group, Inc. ("PCG"), Cal Mitchell, Chief Executive Officer for Conversay, Stephen Rondel, Chairman of Conversay, and others began contacting Simmons about possibly investing in Conversay, a computer software development company. In particular, Defendants provided Simmons with a private offering memorandum dated November 21, 2006, that, stated, among other things, that the Company projected that its revenue stream would grow from $14,000,000 in 2007 to over $1,000,000,000 by 2011.[1] Further, during a telephone call that took place in or around May 2007, Mr. Rondel told Plaintiff that all of the Company's debt obligations had been converted to stock and were gone. Also, in June 2007, during phone conversations with Plaintiff, Mr. Rondel and Mr. Mitchell represented that a group of Australian investors was close to completing a $10,000,000 to $15,000,000 investment in the Company. Mitchell and Rondel further stated that the Australians were conducting due diligence on site at Conversay and were literally just down the hall. In addition to the above representations, Plaintiff received numerous newsletters and correspondences, which were addressed "Dear Stockholder," that allegedly falsely touted the Company's prospects. During this time, Defendants failed to disclose that Conversay owed PCG, one of the parties who was actively pursuing Simmons' investment in the Company, $400,000 and that this debt was bearing interest at the rate of 10% per month.

---

[1]The Memorandum contained cautionary statements relating to its forward-looking statements.

Based on Defendants' representations, Simmons decided to invest in Conversay. In an email dated June 13, 2007, PCG, acting on behalf of Conversay, informed Simmons of the steps it needed to take in order to complete its "Conversay investment," namely that Simmons needed to fill out and sign a convertible note agreement. On the same day it received PCG's email, Simmons filled out a convertible note agreement in the amount of $300,000. It also signed a subscription agreement, which contained, among others, the following three provisions:

> 2.14 The Purchaser or his professional advisor has been granted the opportunity to conduct a full and fair examination of the records, documents and files of the Company, to ask questions of and receive answers from representatives of the Company, its officers, directors, employees and agents concerning the terms and conditions of this offering, the Company and its business and prospects, and to obtain any additional information which the Purchaser or his professional advisor deems necessary to verify the accuracy of the information received, including but not limited to the Company's PPM.
>
> 2.16 The Purchaser has relied completely on the advice of, or has consulted with, his own personal tax, investment, legal or other advisors and has not relied on the Company or any of its affiliates, officers, directors, attorneys, accountants or any affiliates of any thereof and each other person, if any, who controls any thereof, within the meaning of Section 15 of the Securities Act, except to the extent such advisors shall be deemed to be as such.
>
> 2.19 The Purchaser is a sophisticated investor (as defined in Rule 506(b) of Regulation D promulgated under the Securities Act ("Regulation D")) and an accredited investor (as defined in Rule 501 of Regulation D), and Purchaser has such experience in business and financial matters that it is capable of evaluating the merits and risks of an investment in the securities. The Purchaser acknowledges that the securities are speculative and involve a high degree of risk, including the potential loss of the Purchaser's investment herein and the Purchaser has taken cognizance of and understands the risk factors related to the purchase of the securities.

On June 26, Simmons filled out another agreement in the amount of $400,000. Both of the notes had a maturity date of December 31, 2007, accrued interest at 8% annually, and were convertible into common stock of Conversay at a conversation rate of $.20 per share, which was a fifth of what

the Company told Simmons the Australian investors' conversation rate was going to be.[2] Due to Simmons' investment, Conversay granted Simmons warrants, which provided Simmons with the right to purchase up to 700,000 additional shares of common stock in Conversay at $.20 per share. Two days after the investment was completed, PCG sent Simmons an email stating that Conversay was in daily contact with the Australians and that their investment was imminent.

In late December 2007, shortly before the maturity date of the convertible notes, Plaintiff agreed to execute two note extension agreements with respect to each of the convertible notes. These agreements extended the notes' maturity and convertible dates to December 30, 2008. Plaintiff contends that they were induced to sign the extension agreements based on, among other things, representations made by PCG, Rondel, and Mitchell in November and December of 2007 that a group of Australian investors were going to invest in the Company, representations by PCG, Rondel, and Mitchell in November and December of 2007 that the Company was going to go public in the very near future and had already entered in an engagement with a broker dealer, and a representation made during a shareholder meeting in December of 2007 that the Company was going to be launching five new products in 2008.

Unfortunately for all of the parties involved, Defendants' grandiose projections and promises did not come to fruition. The Australians never made a substantial investment. In fact, at a meeting on June 2, 2008, Mitchell allegedly told Plaintiff that while there were potential Australian investors, they were never just down the hall and were never anywhere near committed to investing in the Company. Conversay did not go public. Five new products were not launched in 2008. The Company's revenue for 2007 was a mere $1,000,000. Apparently sensing that Conversay may not

---

[2] Because Conversay's conversion rate was allegedly a fifth of the Australian investors', Defendants Rondel and Mitchell cautioned Simmons not to advise the Australians of the terms of its agreement with Conversay.

be able to repay the debt owed, on November 6, 2008, Simmons entered into a written repayment agreement with Conversay, Defendant Keys Business Group ("KBG"), and Defendant Robert Keys,[3] a director of Conversay and CEO of PCG, that provided that Simmons would be paid $810,782 by December 30, 2008. Defendant Keys also executed a written personal guaranty guaranteeing the amount owed under the repayment agreement. Defendants have yet to pay Simmons the amount stated.

Due to Defendant's failure to pay the debt owed, Simmons filed suit. Defendants filed a motion to dismiss the original complaint (Doc. 14). Simmons filed an amended complaint, asserting the following causes of action: (1) a Rule 10b-5 and section 10(b) claim,[4] (2) a state law securities fraud claim, (3) a state law fraud claim, (4) a state law negligent misrepresentation claim, (5) a state law breach of fiduciary duty claim, (6) a state law breach of the duty of loyalty claim, (7) a state law breach of contract claim based on the breach of the repayment agreement, (8) a state law breach of contract claim based on the personal guaranty, (9) a state law breach of good faith and fair dealing claim based on the repayment agreement, and (10) a state law breach of good faith and fair dealing claim based on the personal guaranty. Defendants filed another motion to dismiss (Doc. 31), seeking to have Plaintiff's first six causes of actions dismissed. For the reasons stated below, the Court denies Defendants' motions.

---

[3] Defendant Keys has filed a petition for bankruptcy, which has the effect of staying the proceeding against him, but not against the other solvent codefendants. *See, e.g., Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1330 (10th Cir. 1984). Key's petition for bankruptcy has no effect on this Court's resolution of the pending motions.

[4] As noted by the Tenth Circuit in the SEC enforcement action context, "[t]he scope of Rule 10b-5 is coextensive with the coverage of Section 10(b)." *See, e.g., S.E.C. v. Wolfson*, 539 F.3d 1249, 1256 n.11 (10th Cir. 2008). Therefore, the Court will refer to section 10(b) and Rule 10b-5 collectively as "section 10(b)" in this Order. *See id*.

**STANDARD OF REVIEW**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' "[5] "[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."[6] "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[7]

In determining whether a claim is facially plausible, the Court must draw on its judicial experience and common sense.[8] All well pleaded facts in the complaint are assumed to be true and are viewed in the light most favorable to the plaintiff.[9] Allegations that merely state legal conclusions, however, need not be accepted as true.[10]

**Analysis**

Defendants claim that the first six causes of action asserted by Plaintiff should be dismissed. The Court will address Defendants' arguments in turn.

---

[5]*Ashcroft v. Iqbal*, - - - U.S. - - -, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[6]*Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[7]*Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003).

[8]*Iqbal*, 129 S. Ct. at 1950.

[9]*See Zinermon v. Burch*, 494 U.S. 113, 118 (1990); *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984).

[10]*See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

**Count I –Section 10(b) claim**

To state a claim under section 10(b), a plaintiff must allege the following five elements: (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.[11] Defendants argue that Plaintiff's section 10(b) claim should be dismissed because the notes in question are not securities, as the maturity date does not exceed nine months, that the alleged misstatements were neither material, as they were vague statements of corporate optimism or subject to the bespeaks caution doctrine and/or the Private Securities Litigation Reform Act's ("PSLRA") safe harbor provision, nor made in connection with the purchase of any security, and many of the alleged misstatements were not plead with the specificity required by Fed. R. Civ. P. 9(b) and the PSLRA. The Court finds each of these arguments meritless.

First, the Court finds that Plaintiff has adequately alleged that the notes in question are securities. The Securities Exchange Act of 1934 define the term "security" to include "any note."[12] However, in *Reves v. Ernest & Young*[13], the Supreme Court did not interpret the Act to include every note, rather, it stated that whether a note is a security hinges upon the application of what it called

---

[11]*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).

[12]*See* 15 U.S.C. § 78c(a)(10).

[13]494 U.S. 56 (1990).

the family resemblance test.[14] Under this test, every note is presumed to be a security, irrespective of when the note matures.[15] This presumption can be overcome, though, under either step of a two-tiered analysis. During the first step, courts are to compare the note in question to the several types of notes that the Supreme Court has specifically stated are not securities, which are: notes delivered in consumer financing, notes secured by a mortgage on a home, short-term notes secured by a lien on a small business or some of its assets, notes evidencing a character loan to a bank customer, short-term notes secured by an assignment of accounts receivable, notes which simply formalize an open-account debt incurred in the ordinary course of business, and notes evidencing loans by commercial banks for current operations.[16] When making this comparison, courts are to consider the following four factors: (1) the parties motivations for entering into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering the application of the Act unnecessary.[17] If the court does not find that a strong resemblance exists between the note in question and the notes the Supreme Court has identified as not being securities, the court then moves on to step two, which is deciding whether a new category of notes should be added to the list.[18]

---

[14]*See id.* at 64-65.

[15]*See S.E.C. v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1132 (9th Cir. 1991) ("We agree with these circuits that logic and legislative history favor limiting the short-term note exception to commercial paper and hold that the presumption that a note is a security applies equally to notes of less than nine months maturity that are not commercial paper.").

[16]*See Reves*, 494 U.S. at 65.

[17]*See id.* at 66-67.

[18]*See id.* at 67.

Tellingly, Defendants have not argued that the notes in question are not securities under the aforementioned test.[19] Even if they had, though, the Court would still find that Plaintiff's notes do not strongly resemble the notes the Supreme Court has recognized as not being securities or are the type of note that should be added to that Supreme Court's list. The first factor weighs in favor of finding the notes to be a security, as the alleged purpose of selling the notes was to raise money for the Company's general use and Plaintiff's motivation in making the investment was to make a profit.[20] The second factor does not weigh in favor of finding Plaintiff's notes to be a security because it does not appear based on Plaintiff's allegations that the notes were offered to a broad segment of the public.[21] The third factor weighs in favor of finding that the notes are securities because Defendants advertised them as investments and the notes were convertible into common stock in the Company.[22] The fourth factor is neutral because, while there is no federal regulation applicable to the notes, which courts have recognized as a factor weighing in favor of finding a note to be a security,[23] one of the defendants personally guaranteed the amount owed, which reduces Plaintiff's risk and thus militates against a finding that the instruments in question are a security. Viewing these factors as a whole, the Court concludes that the notes at issue here do not strongly resemble a note declared by the Supreme Court to not be a security. Furthermore, the application of the four factor test leads the Court to the conclusion that these type of notes should not be added

---

[19]This fact alone is a sufficient enough reason to find that the notes in question are a security. *See Wilms v. Laughlin*, 2011 WL 42676, at *2 (D. Colo. Jan. 6, 2011).

[20]*Reves*, 494 U.S. at 66.

[21]*Id.* at 68.

[22]*Id.* at 68-69.

[23]*Holloway v. Peat, Marwick, Mitchell & Co.*, 900 F.2d 1485, 1488 (10th Cir. 1990).

to the Supreme Court's list. As a consequence, the Court finds that Plaintiff has adequately alleged that the instruments in question are a security.[24]

Defendants contend that irrespective of whether the notes in question pass the *Reves* test, the Court should find that they are not securities because their maturity dates at the time of issuance did not exceed nine months. In support of their position, Defendants cite to section 3(a)(10) of the Securities Exchange Act of 1934, which provides that any note that does not exceed nine months is excluded from the definition of a security. The Tenth Circuit has interpreted this provision to apply only to "prime quality negotiable commercial paper of a type not ordinarily purchased by the general public."[25] Here, Simmons has not alleged that the notes in question are prime quality negotiable commercial paper and Defendants have not produced documentation that they are. Accordingly, Defendants' motion cannot be granted on the first ground advanced by Defendants.

Second, Plaintiff has alleged that Defendants made material misleading statements in connection with the purchase of securities. A statement or omission is material if a reasonable investor would consider it important in determining whether to buy or sell stock.[26] The Tenth Circuit has recognized at least two categories of statements that generally will not be considered material: first, vague statements of corporate optimism, and second, forward-looking statements that are accompanied with sufficient cautionary language that nullify any potential misleading effect.[27]

---

[24]*See Stoiber v. S.E.C.*, 161 F.3d 745, 752 (D.C. Cir. 1998) (finding a note be a security even though only two of the factors weighed in favor of making such a finding), *cert. denied*, 526 U.S. 1069 (1999).

[25]*Holloway*, 900 F.2d at 1489.

[26]*See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997).

[27]*Id.* at 1119-20.

Statements of corporate optimism and forward-looking statements may be material, though, if the speaker knew at the time the statements were made that they were untrue or had no reasonable basis in fact.[28] Here, among other things, Plaintiff has alleged that at the time it purchased the convertible notes Defendants represented that a group of Australian investors were going to make a substantial investment in the Company. Plaintiff has further alleged facts that demonstrate that it relied on this representation when deciding whether to invest in Conversay, that the representation was false and had no reasonable basis in fact, and that Defendants knew the representation was false and had no basis in fact when made, thus making the PSLRA safe harbor provision not applicable. Viewing these allegations as a whole, the Court concludes that they are sufficient to make it plausible that Defendants knowingly made material false and misleading statements in connection with the purchase of securities. As for the other alleged false and misleading representations contained in Plaintiff's complaint, the Court declines to address Defendants' arguments that they are neither materially false nor misleading.

Third, the Court finds that Plaintiff has pled its security fraud claim with the specificity required by Rule 9(b) and the PSLRA. Under Rule 9(b), a complaint must identify the time, place, and content of the allegedly fraudulent representation, identify the person responsible for it, and identify the consequences thereof. Under the PSLRA, the plaintiff must state with particularity facts that give rise to a strong inference that the defendants made the alleged misrepresentations with the requisite scienter. The Court finds that at least the allegations relating to Defendants' representation about the Australian investors meet Rule 9(b)'s and the PSLRA's requirements. Because this representation is sufficiently pled, the Court does not address Defendants' argument that other

---

[28]*See id.* at 1120 n.6; *Milman v. Box Hill Systs Corp.*, 72 F. Supp. 2d 220, 232 (S.D.N.Y. 1999).

allegations in the complaint relating to other representations allegedly made by Defendants do not satisfy the requirements set forth by Rule 9(b) and the PLSRA.

In sum, the Court finds that Plaintiff has adequately pled a section 10(b) claim. As a result, it denies Defendants' motion as it relates to that claim.

**Count II – Kansas Uniform Security Act Claim**

The elements for making a claim under the Kansas Uniform Security Act are essentially the same as those for making a section 10(b) claim.[29] Defendants contend that Plaintiff's state law security fraud claim should be dismissed for the same reasons that its section 10(b) claim should be dismissed. Because the Court has found that the reasons asserted by Defendants are insufficient to dismiss Plaintiff's section 10(b) claim, the Court also finds that they are insufficient to dismiss the state law security fraud claim.

**Count III – State Law Fraud Claim**

The elements of common-law fraud in Kansas are: (1) a false statement was made as a statement of existing and material fact; (2) the representation was known to be false by the party making it or was recklessly made without knowledge concerning falsity; (3) the representation was intentionally made for the purpose of inducing another party to act upon it; (4) the other party reasonably relied and acted upon the representation made; and (5) the other party sustained damage by relying upon the representation.[30] While it is true that fraud claims generally must relate to some material present or pre-existing fact, they can be predicated upon promises or representations

---

[29]*Compare* K.S.A. 17-12a509(b) *with* 15 U.S.C. § 78j(b).

[30]*See Kelly v. Vinzant*, 287 Kan. 509, 515, 197 P.3d 803, 808 (2008).

regarding a future event if the circumstances tend to show that a fraudulent intent existed at the time that the promise or representation was made.[31]

Here, Defendants argue that Plaintiff's fraud claim should be dismissed because none of the misrepresentations in the complaint are material or are alleged with sufficient particularity, Plaintiff cannot prove reasonable reliance on any alleged misrepresentation because it signed a stock subscription agreement that stated that Plaintiff was a sophisticated investor and had not relied upon the Company or any of its affiliates, and a number of the alleged misrepresentations relate to future events. The Court disagrees. First, Plaintiff has sufficiently pled that material misrepresentations were made. For example, it has alleged that in June, November, and December of 2007, Mr. Rondel and Mr. Mitchell, through telephone calls, letters, and emails, represented that Australian investors were just about to make a substantial investment in Conversay. According to Plaintiff's complaint, Mr. Mitchell later admitted that these representations were merely a ploy to lure investors into investing in Conversay and that the Australian investors were never close to making an investment in the Company. Additionally, Plaintiff has alleged that in November and December 2007, Mr. Rondel and Mr. Mitchell, through telephone calls, letter, and emails, represented that the Company was in the advanced stages of going public. Plaintiff also claims that these representations were false. In light of these allegations, the Court finds that Plaintiff has adequately alleged that material misrepresentations were made, and, as a consequence, will not address Defendants' argument that Plaintiffs' other allegations cannot serve as a basis of its fraud claim. Second, the fact that Plaintiff signed a subscription agreement that contained a provision stating that Simmons had not relied on the Company or any of its affiliates and that it was a sophisticated investor does not mean that

---

[31]*See Edwards v. Phillips Petroleum Co.*, 187 Kan. 656, 660, 360 P.2d 23, 26 (1961).

Plaintiff cannot show reasonable reliance upon Defendants' alleged misrepresentations. At this point in the litigation, reading the provisions in context, the Court cannot say that it establishes that Plaintiff did not rely on Defendants' representations regarding the Company's welfare or future. As a result, the Court concludes that the provisions do not make Plaintiff's allegation that it relied on the statements discussed earlier in this paragraph implausible. Third, while the Australian investors and imminent initial public offering representations relate to future matters, Plaintiff has alleged facts demonstrating that these representations were knowingly false when made. Thus, for these reasons, the Court finds that Plaintiff has adequately alleged a fraud claim, and accordingly deny Defendant's motion as it relates to this claim.

**Count IV – State Law Negligent Misrepresentation Claim**

The elements of a negligent misrepresentation claim are essentially the same as those for a fraudulent misrepresentation claim with one major exception: negligent misrepresentation does not require that the misrepresentation be made knowingly.[32] Defendants argue that Plaintiff's negligent misrepresentation claim should be dismissed for the same reasons that Plaintiff's fraudulent misrepresentation claim should be dismissed. Because the Court finds that the reasons asserted by Defendants for dismissing the fraudulent misrepresentation do not justify dismissing that claim, the Court also finds that they do not justify dismissing Plaintiff's negligent misrepresentation claim.

**Count V – State Law Breach of Fiduciary Duty Claim**

Defendants argue that Plaintiff's breach of fiduciary duty claim should be dismissed because they did not owe Simmons a fiduciary duty, as it was merely a creditor, that they did not breach any fiduciary duty owed, and that Plaintiff was not damaged by their breach, assuming there was one.

---

[32]*See Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, 604, 875 P.2d 609, 616 (1994).

Kansas law recognizes two types of fiduciary relationships: first, those specifically created by contract, and second, those implied in law due to the factual situation surrounding the transaction and the relationship of the parties.[33] Here, Plaintiff has not alleged that the relationship was created by contract; therefore, the Court must determine whether the alleged facts are such that a relationship could be implied in law. The Kansas Supreme Court has identified the following factors as relevant to this determination: whether one person acted for another; whether one person had and exercised influence over another; whether one person reposed his confidence in another; whether one party dominated another; the inequality of the parties; and the dependence of one person upon another.[34] Due to the fact intensive nature of the inquiry, "[t]he Kansas Supreme Court has refused . . . to give an exact definition to fiduciary relationships."[35]

Plaintiff has adequately alleged a breach of fiduciary duty claim. First, it has adequately alleged that a duty was owed. While it is true that Plaintiff is technically a creditor, this fact is not dispositive.[36] Rather, the determination of whether a fiduciary relationship could plausibly exist hinges upon the circumstances surrounding the transaction. Here, Plaintiff has asserted facts indicating that there was an information asymmetry between the parties, as Defendants were insiders and thus most likely privy to information that it was not. Furthermore, Plaintiff has alleged facts

---

[33]*First Bank of Wakeeney v. Moden*, 235 Kan. 260, 262, 681 P.2d 11, 13 (1984).

[34]*Id.* at 262, 681 P.2d at 13.

[35]*Reebles, Inc. v. Bank of Am., N.A.*, 29 Kan. App. 2d 205, 209, 25 P.3d 871, 874 (2001).

[36]*See, e.g., Phillips v. Carson*, 240 Kan. 462, 478, 731 P.2d 820, 833 (1987) ("A fiduciary relation does not depend upon some technical relation created by, or defined in, law. It may exist under a variety of circumstances, and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence."). As stated in its complaint, Plaintiff is only alleging that Defendants owed it a fiduciary relationship after it had entered into the notes agreements.

-15-

demonstrating that it looked to Defendants to accurately assess the Company's prospects and future, and that Defendants knew Plaintiff would be relying upon it representations. Based on these allegations, the Court finds that Plaintiff has plausibly alleged that Defendants owed it a fiduciary duty.[37] Second, Plaintiff has adequately alleged that Defendants violated their duty by supplying it with information that they knew to be false. Third, Plaintiffs have alleged that it relied to its detriment on Defendants' misrepresentation, as it gave up its right to demand repayment at the end of 2007 by extending the maturity date of the notes. In light of these allegations, the Court concludes that Plaintiff has adequately alleged a breach of fiduciary duty claim.

**Count VI – Breach of the Duty of Loyalty Claim**

As recognized by Defendants, the elements for a breach of the duty of loyalty claim are similar to those for a breach of a fiduciary duty claim. Due to this similarity, Defendants contend that the Court should dismiss Plaintiff's breach of the duty of loyalty claim for the same reasons that it should dismiss Plaintiff's breach of fiduciary claim. Because the Court finds that Defendants' arguments are insufficient to dismiss Plaintiff's fiduciary claim, it also finds that they are insufficient to dismiss Plaintiff's loyalty claim.

**IT IS THEREFORE ORDERED** that Defendants' joint motion to dismiss Plaintiff's amended complaint (Doc. 31) is hereby DENIED.

---

[37]*See Linden Place, LLC, v. Stanley Bank*, 38 Kan. App. 2d 504, 512, 167 P.3d 374, 380 (2007) (finding that a genuine issue of material fact existed as to whether a debtor's bank owed one of the debtor's business partners a fiduciary duty where the debtor's business partner called and told the bank that the debtor was improper using the money that the bank was lending to him, the bank stated that it was going to take care of the problem, and the bank knew that the debtor's continued misuse of the loan money could financially injure the business partner); *see also Dugan v. First Nat'l Bank in Wichita*, 227 Kan. 201, 208, 606 P.2d 1009, 1015 (1980) (stating that a fiduciary relationship between a bank and depositor usually arises when the bank has "dealt directly with the customer regarding the matters involved in the litigation, and the bank had knowledge of the reliance and confidence of the customer).

**IT IS FURTHER ORDERED** that Defendants' joint motion to dismiss Plaintiff's complaint (Doc. 14) is hereby DENIED AS MOOT.

**IT IS SO ORDERED**.

Dated this 17th day of February, 2011.

*[signature]*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE